UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| L1 TECHNOLOGIES, INC.; SYNCWISE, LLC; and PIXELS MATTER, LLC,<br><br>                              Plaintiffs,<br><br>v.<br><br>SERHII CHEKANOV,<br><br>                              Defendant. | Case No.: 3:20-cv-00259-H-JLB<br><br>**MEMORANDUM DECISION IN FAVOR OF PLAINTIFFS AND AGAINST DEFENDANT CHEKANOV** |

On February 11, 2020, Plaintiffs L1 Technologies, Inc.[1], Syncwise, LLC, and Pixels Matter, LLC ("Plaintiffs") filed a complaint against Defendant[2] Serhii Chekanov ("Defendant"). (Doc. No. 1.) On October 17, 2020, Plaintiffs filed a first amended complaint ("FAC") alleging that Defendant breached his contract with Pixels Matter, absconded with L1 Technologies' and Syncwise's confidential information, attempted to solicit Plaintiffs' clients, and made defamatory statements about Plaintiffs. (Doc. No. 24.) On August 15, 2023, the Court issued a pre-trial order that attached all of Plaintiffs' exhibits.[3] (Doc. No. 86.) That same day, the Court held a one-day bench trial.[4] (Doc. No. 87.) Patrick Nicholas Reid appeared on behalf of Plaintiffs. (Id.) Defendant failed to

---

[1]   L1 Technologies, Inc. changed its' name to iGolf and some documentary evidence in the record reflects this name change. (Doc. No. 88, 8:20-9:2.)
[2]   Additional Defendants Dmitry Fateev, Roman Kolesnikov, and VebrFOC, Inc. were dismissed from this litigation.   (Doc. Nos. 16, 49, 68.)
[3]   The relevant procedural history is contained in documents 78, 85, and 86.
[4]   Plaintiffs formally waived their right to a jury trial. (Doc. No. 88, 3:3-5.)

1

appear. (Id.) Plaintiffs called Melanie Gregory[5] as their witness and the Court received into evidence Plaintiffs' exhibits attached to the pre-trial order. (Id.)

Under Fed. R. Civ. P. 52(a)(1), "[i]n an action tried on the facts without a jury . . ., the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record . . . or may appear in an opinion or memorandum of decision filed by the court." Fed. R. Civ. P. 52(a)(1). For the foregoing reasons, the Court issues a memorandum decision in favor of Plaintiffs and against Defendant.

## BACKGROUND

L1 Technologies and Syncwise are both software and hardware development companies operating in the golf industry. (Doc. No. 88, 8:9-18, 9:11-22.) Pixels Matter provides software development and engineering services for L1 Technologies and Syncwise and has access to their respective servers. (Id., 10:11-17, 13:14-23, 15:2-5.) On July 1, 2019, Pixels Matter and Defendant entered into an independent contractor agreement (the "Agreement") whereby Defendant was hired as a software engineer. (Doc. No. 86, Ex. 1.) The Agreement states that Defendant will "provide services in the sphere of software development" and that "[Defendant] shall not disclose [any] confidential information" that he may gain access to during his work. (Id.) The Agreement further states that, "[w]hen rendering [his] services," Defendant "can use any products derived from third Parties or developed by [Pixels Matter]," but, in so doing, Defendant cannot "infringe on the third party's rights" and Pixels Matter retains "all property rights" for any "deliverable" developed. (Id.) Additionally, it provides that "all hardware, software, and office appliances remain [the] property of [Pixels Matter]." (Id.) The Agreement states

---

[5] Ms. Gregory is the Chief Technical Officer and President of Pixels Matter. (Doc. No. 88, 7:23-24.) She has previously worked for the other Plaintiffs and is the person most knowledgeable for them. (Id., 7:25-8:8.)

that it "shall be construed and governed in accordance with the laws of the state of California." (Id.)

Defendant was assigned to work on a project, Project Halo, that focused on golf cart control and utilized L1 Technologies' and Syncwise's intellectual property that was available on Pixels Matter's computer servers. (Doc. No. 88, 12:22-13:23.) Shortly after Defendant started work, it became clear to Plaintiffs that Defendant misled Pixels Matter about his credentials as a software engineer because he did not have the basic skills required to do the job. (Id., 13:24-14:7.) Specifically, Defendant produced no usable work product while working for Pixels Matter. (Id.) Additionally, he refused to work with other Pixels Matter employees and became confrontational with his team members. (Id., 14:13-21.) Defendant was terminated in October 2019. (Id., 14:22-15:1; Doc. No. 86, Ex. 11.)

While working at Pixels Matter, Defendant accessed Plaintiffs' confidential intellectual property and absconded with it. (Doc. No. 88, 15:2-8.) Right after his termination from Pixels Matter in October 2019, Defendant used Plaintiff's intellectual property to create VeberFOC, Inc. (Doc. No. 86, Exs. 4, 5, 10.) VeberFOC used Plaintiff's technology and confidential intellectual property to offer competing products at lower prices. (Id., Exs. 2, 3, 4, 5, 10; Doc. No. 88, 36:1-5.) VeberFOC's website was almost identical to L1 Technologies' website and offered the same products and technologies as Plaintiffs. (Doc. No. 88, 37:4-14, 37:16-38:24.) VeberFOC's social media accounts also displayed images of Plaintiffs' products, including one confidential prototype. (Doc. No. 86, Exs. 4, 10; Doc. No. 88, 26:11-27:17.)

Defendant, on behalf of VeberFOC, contacted Plaintiffs' customers and offered the same products as L1 Techonlogies and Syncwise "at [a] fraction of the price." (Doc. No. 86, Ex. 2; Doc. No. 88, 18:13-19:10.) Specifically, Defendant, in reaching out to one of Plaintiffs' customers, stated that VeberFOC "develop[s], design[s], and maintain[s]" a "[d]atabase of about 40,000 GPS maps and full contact informa[tion] for golf courses around the world," "[e]lectric devices and accessories for golf players with geo-data solutions," and "GPS enabled golf cart controls and information displays," among other

items. (Id.) Defendant also reached out to Plaintiffs' clients claiming to "[k]now[] L1's products and design first hand [sic]. I believe we can beat them on both - price and quality." (Doc. No. 86, Ex. 3; Doc. No. 88, 21:18-25.)

Additionally, Defendant made false statements about Plaintiffs' business to the IRS. (Doc. No. 86, Ex. 7.) Specifically, Defendant filed an information referral form (Form 3949-A) with the IRS and reported Plaintiffs for suspected tax law violations. (Id.) According to Defendant's filing, Plaintiffs were hiding their income by and through their various affiliate businesses and overseas operations. (Id.)

Defendant also posted about Plaintiffs on his Instagram page, claiming that they were the "leaders of an obvious terrorist cell located at the address of [Pixels Matter's Ukrainian office address]" and would "forge documents, threaten, create discrediting content, and incite suicide." (Doc. No. 86, Ex. 9.)

Plaintiffs seek relief for: breach of contract, intentional interference with contracts, conversion, and defamation per se.[6]

## DISCUSSION

The Court analyzes the following causes of action under California law because the Agreement states that it "shall be construed and governed in accordance with the laws of the state of California." (Doc. No. 86, Ex. 1.)

**A.    Breach of Contract – Plaintiff Pixels Matter**

    i.    <u>Plaintiff Pixels Matter and Defendant Formed a Valid Contract</u>

To be valid under California law, a contract must have (1) parties capable of contracting, (2) consent, (3) a lawful object, and (4) a sufficient cause or consideration. Cal. Civ. Code § 1550. Mutual consent is manifested through the process of offer and acceptance. <u>Pac. Corporate Group Holdings, LLC v. Keck</u>, 181 Cal. Rptr. 3d 399, 411

---

[6] Plaintiffs' dismissed the following causes of action: breach of covenant of good faith and fair dealing; fraud; negligent misrepresentation; breach of fiduciary duty; conspiracy; misappropriation by acquisition; unjust enrichment; unfair and deceptive trade practices; unfair competition; and trade libel. (Doc. Nos. 64, 69, 79, 87.)

(2014).  "[A] party's intent to contract is judged objectively, by the party's outward manifestation of consent." Cedars Sinai Med. Ctr. v. Mid-West Nat'l Life Ins. Co., 118 F. Supp. 2d 1002, 1008 (C.D. Cal. 2000).

Based on the evidence before the Court, Plaintiff Pixels Matter and Defendant formed a valid contract. (Doc. No. 86, Ex. 1.)  Here, both parties were capable of entering into a contract for the performance of services: Defendant received a masters degree and had been in the workforce since January 2014 and Pixels Matter is a business entity in good standing in California. (Doc. No. 86, Ex. 11; Doc. No. 69 at 8.)  Pixels Matter presented a document titled "Independent Contractor Agreement # 58" to Defendant and both Defendant and Pixels Matter signed the Agreement. (Doc. No. 86, Ex. 1.)  By signing the Agreement, Defendant agreed to "provide services in the sphere of software development" for a value not to exceed $1,500.00 USD per month or $20,000.00 USD per year.  (Id.) The contract therefore contained a lawful object and sufficient consideration.  Accordingly, the parties entered into a valid contract. Keck, 181 Cal. Rptr. at 411.

  ii. Defendant Breached the Terms of the Agreement

The elements of breach of contract are (1) the existence of a contract, (2) the plaintiff's performance of the contract or excuse for nonperformance, (3) the defendant's breach, and (4) the resulting damage to the plaintiff. Richman v. Hartley, 224 Cal. App. 4th 1182, 1186 (2014). The language of the contract governs a court's interpretation of the parties' obligations when the language is clear and explicit. Vons Cos., Inc. v. United States Fire Ins. Co., 78 Cal. App. 4th 52, 58 (2000) (citing Gen. Star Indem. Co. v. Sup. Ct., 47 Cal. App. 4th 1586, 1592 (1996)).  Here, the parties formed a contract when both Pixels Matter and Defendant signed the Agreement. (Doc. No. 86, Ex. 1.)  Pixels Matter performed on the contract by paying Defendant pursuant to the terms of the agreement. (Doc. No. 88, 76:9-18.)  Specifically, Pixels Matter paid Defendant for three months of work—$4,500—pursuant to the terms of the Agreement. (Doc. No. 86, Ex. 1; Doc. No. 88, 76:9-18.)  Next, the Court evaluates whether Defendant breached the contract.

Based on the evidence presented to the Court, Defendant breached multiple sections of the Agreement. Pixels Matter hired Defendant to work as a firmware engineer on Project Halo, one of its controller projects. (Doc. No. 88, 12:22-13:23.) Project Halo focused on golf cart control systems. (Id.) Section 5 of the Agreement required Defendant to ensure that the work he provided was "high quality and competen[t]." (Doc. No. 86, Ex. 1.) The Court heard testimony that Defendant lacked the basic knowledge and skills necessary to execute the job. (Doc. No. 88, 13:24-14:7.) Defendant, notably, failed to produce any functioning work-product. (Id.)

Due to Defendant's inability to produce any useful work product, Pixels Matter had to hire another engineer to redo all of Defendant's work. (Id., 74:12-17.) Additionally, Pixels Matter had to reassign another engineer to the project to make up for the time lost by Defendant. (Id., 75:4-8, 75:21-76:5.) The Court heard testimony that it took around a year for the two engineers to redo Defendant's work and to dig out of the hole caused by Defendant's unproductivity. (Id., 74:12-17, 75:4-8, 75:21-76:5.) Additionally, Defendant's actions caused a significant delay in Project Halo coming to market with a workable product which upset Plaintiffs' customers. (Id., 74:18-23.)

Section 7 of the Agreement also required that Defendant "shall not disclose confidential information," cannot "infringe on the third party's rights", and must make sure that "all hardware, software, and office appliances remain" Pixels Matter's property. (Doc. No. 86, Ex. 1.) The Court heard testimony that Defendant accessed Plaintiffs' confidential intellectual property on Pixels Matter's servers and absconded with it. (Doc. No. 88, 15:2-8.) Specifically, Defendant took Plaintiffs' software related to its golf course data, hand held products, and golf cart displays. (Doc. No. 86, Exs. 2, 3, 4, 10.) Defendant used Plaintiffs' confidential intellectual property to create his own company, VeberFOC, that sold identical products to Plaintiffs. (Id.) Defendant then solicited Plaintiffs' customers stating that VeberFOC could offer Plaintiffs' products at a cheaper price. (Doc. No. 86, Exs. 2, 3.) In sum, Defendant breached both sections 5 and 7 of the Agreement.

Given Defendant's breach, the Court turns to the appropriate measure of damages. "Contract damages are generally limited to those within the contemplation of the parties when the contract was entered into or at least reasonably foreseeable by them at that time." Applied Equipment Corp. v. Litton Saudi Arabia Ltd., 7 Cal. 4th 503, 515 (1994). "This limitation on available damages serves to encourage contractual relations and commercial activity by enabling parties to estimate in advance the financial risks of their enterprise." Id. Notably, the Agreement does not contain an attorneys' fees provision. (Doc. No. 86, Ex. 1.) Based on Defendant's breach, the Court heard testimony that Plaintiff Pixels Matter is seeking damages in the range of $55,000 to $75,000. (Doc. No. 88, 93:9-15.) That range is based on Plaintiff Pixels Matter's cost to hire a new engineer, reassign an engineer, pay two engineers a year's worth of salary, and the amount paid to Defendant. (Id., 74:12-17, 75:4-8, 75:21-76:5.) The maximum yearly compensation listed in Defendant's standard[7] independent contractor agreement with Pixels Matter is $20,000. (Doc. No. 86, Ex. 1; Doc. No. 88, 10:25-11:3.) One years' salary for two engineers amounts to $40,000, the amount paid to Defendant was $4,500, and a reasonable cost to go through the hiring process to hire a new employee and reassign an existing employee is $10,500. (Doc. No. 86, Ex. 1; Doc. No. 88, 10:25-11:3, 76:9-18, 93:9-15.) Accordingly, Defendant breached his contract with Pixels Matter and is liable to Plaintiff Pixels Matter in the amount of $55,000. See Applied Equipment Corp., 7 Cal. 4th at 515.

### B. Intentional Interference with Contractual Relations – Plaintiffs L1 Technologies, Syncwise, and Pixels Matter

To succeed on a claim for intentional interference with contracts, a plaintiff must prove: (1) a valid contract between the plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual

---

[7] The Court heard testimony that all engineers receive that agreement. (Doc. No. 88, 11:4-11:5.)

relationship; and (5) resulting damage. Pacific Gas & Electric Co. v. Bear Stearns & Co., 50 Cal. 3d 1118, 1126 (1990). An action for intentional interference with contracts lies only against a stranger to the contract. Applied Equip. Corp. v. Litton Saudi Arabia Ltd., 7 Cal.4th 503, 513–14 (1994). Notably, "the plaintiff need not allege an actual breach, but only interference with or disruption of his or her contractual relations." LiMandri v. Judkins, 52 Cal.App.4th 326, 344 (1997). Intent is shown if a plaintiff proves that "the defendant knows that the interference is certain or substantially certain to occur as a result of his action." Tuchscher Dev. Enters., Inc. v. San Diego Unified Port Dist., 106 Cal.App.4th 1219, 1221 (2003) (internal quotation and citation omitted).

  Here, Plaintiffs presented testimony at trial that, at the relevant time, they had contracts with the following entities, who are, or have been, their customers: Bushnell, Yamaha, Powakaddy, Motocaddy, and TecTecTec. (Doc. No. 88, 17:21-18:7, 20:5-15, 30:14-16, 32:15-19.) Defendant is not a party to Plaintiffs' contracts with those five companies. (Id.) Even if one of the Plaintiffs is not a party to a contract with those companies, all Plaintiffs would be a third-party beneficiary of the contracts. Additionally, the Court heard testimony that Defendant knew that Bushnell, Yamaha, Powakaddy, Motocaddy, and TecTecTec were, or have been, customers of Plaintiffs. (Doc. No. 88, 36:7-10.) Specifically, Defendant knew that Plaintiffs had contracts with these entities because Defendant reached out to these companies and offered to "beat [Plaintiffs] on both price and quality" because he knew "L1's products and design first hand." (Doc. No. 86, Ex. 3.) And, in November 2019, Defendant targeted three of Plaintiffs' customers—TecTecTec, Bushnell, and Yamaha—on VeberFOC's instagram page by tagging them in posts where he claimed he was selling "new" VeberFOC products that were identical to Plaintiffs' products. (Doc. No. 86, Ex. 10; Doc. No. 88, 26:11-17, 27:11-20, 29:2-30:5, 30:6-25.) Defendant also reached out to an executive of Motocaddy, Tony Webb, and offered to provide him with services related to a database of 40,000 gps golf course maps, electronic devices and accessories, and gps enabled golf cart controls and information displays—Plaintiffs' exact line of products. (Doc. No. 86, Ex. 2.) By specifically targeting

Plaintiffs' customers and offering Plaintiffs' stolen products at a reduced price to those customers, Defendant took intentional acts to disrupt Plaintiffs' contractual relations.[8] See Integrated Healthcare Holdings, Inc. v. Fitzgibbons, 140 Cal.App.4th 515, 533 (2006) (holding that culpable intent may be inferred from conduct that is "substantially certain" to interfere with the contract).

Having proven that Defendant knew of Plaintiffs' contracts and took acts to intentionally disrupt them, Plaintiffs must next prove an actual breach or disruption of the contractual relationship. Pacific Gas & Electric Co., 50 Cal. 3d at 1126. Here, the Court heard testimony that Plaintiffs had to contact their customers and reassure them about the security of their products and the pricing of their products. (Doc. No. 88, 35:15-25, 36:14-37:3). In those discussions, Plaintiffs had to ensure that the specific products they were building for their customers were secure and that they weren't letting their competitors know about them. (Id., 36:17-24.) As a result, the Court heard testimony that Plaintiffs' customers questioned Plaintiffs' pricing and still question their pricing to this day. (Id., 36:25-37:3.) Plaintiffs were burdened by the remedial measures they had to take to protect their contractual relationships. (Id., 35:18-25.) Thus, Plaintiffs have proven a disruption of their contractual relationships. See, e.g., Pacific Gas & Electric Co., 50 Cal. 3d at 1129 (holding that a disruption occurs when a defendant's conduct makes performance of the contract more expensive or burdensome); Golden West Baseball Co. v. City of Anaheim, 25 Cal.App.4th 11, 51 (1994) (same). Plaintiffs have also proven that they were harmed by Defendant's actions because there was a loss of trust in the relationships that Plaintiffs spent years developing. (Doc. No. 88, 36:14-37:3, 39:25-40:5).

---

[8] Plaintiffs also provided evidence of a seemingly unified plan to besmirch Plaintiffs and their products in front of their customers on various social media sites. (Doc. No. 86, Exs. 6, 8.) For example, the same message stating that L1 Technologies' workers were unskilled was posted on Motocaddy, Yamaha, TecTecTec, and Bushnell's various social media sites. (Id.)

Plaintiffs are seeking injunctive relief to restrain continued interference. (Doc. No. 86; Doc. No. 88, 94:3-5, 95:13-20.) California courts have long held that an injunction is a proper remedy for a claim of intentional interference with contractual relationships. Imperial Ice Co. v. Rossier, 18 Cal.2d 33, 38 (1941); California Grape Control Board v. California Produce Corp., 4 Cal.App.2d 1, 44 (1935). Accordingly, Plaintiffs have proven their claim for intentional interference with contractual relationships and the Court will issue appropriate injunctive relief.

### C. Conversion – Plaintiffs L1 Technologies, Syncwise, and Pixels Matter

"Conversion is the wrongful exercise of dominion over the property of another." Welco Electronics, Inc. v. Mora, 223 Cal.App.4th 202, 208 (2014). To prove a claim for conversion, a plaintiff must show: (1) the plaintiff's ownership or right to possession of the property, (2) the defendant converted the property by a wrongful act or by a wrongful disposition of property rights, and (3) damages. Lee v. Hanley, 61 Cal. 4th 1225, 1240 (2015). "Conversion is a strict liability tort. The foundation of the action rests neither in the knowledge nor the intent of the defendant . . . Therefore, questions of the defendant's good faith, lack of knowledge, and motive are ordinarily immaterial." Id. (internal citation and quotation omitted). Here, Defendant committed the tort of conversion when he took a copy of Plaintiffs' confidential intellectually property from Pixels Matter's servers without their permission. Indeed, he even represented to Plaintiffs' customers that he had Plaintiffs' intellectual property. (Doc. No. 86, Exs. 2, 3, 4, 10.)

Plaintiffs have shown that they own the confidential intellectual property at issue here. Section 10 of the Agreement provides that Pixels Matter "solely and exclusively holds and owns deliverable[s]," including, all deliverables developed by Defendant or by a third party on Defendant's instruction. (Doc. No. 86, Ex. 1.) Section 10 also provides that Defendant may "use any products derived from third parties" but, when using those products to render services, Defendant must not "infringe [on] the third party's rights." (Id.) The Court heard testimony that as used in the Agreement, deliverables means "proprietary information of electrical designs, mechanical designs, firmware . . ., software,

mobile applications, websites, databases, [and] back-end server systems." (Doc. No. 88, 11:23-12:12.) It took Plaintiffs several years with around seventy-five employees working at any time to create their intellectual property. (Id., 39:25-40:5.) There is no dispute that the intellectual property is owned by L1 Technologies and Syncwise and it was in the possession of Pixels Matter. (Id., 24:8-13, 25:21-26:1.) It was in the possession of Pixels Matter, on Pixels Matter's servers, because Pixels Matter is a dedicated engineer group that builds out products for both L1 Technologies and Syncwise. (Id., 10:11-17; 15:2-18.) Accordingly, L1 Technologies and Syncwise have proven that they owned the intellectual property and that Pixels Matter had a right to possess the intellectual property.

Next, the Court heard testimony that Defendant removed the intellectual property belonging to L1 Technologies and Syncwise from Pixels Matter's computer servers. (Doc. No. 88, 15:2-8.) Defendant worked at Pixels Matter between July 2019 and October 2019. (Doc. No. 86., Ex. 1, 11; Doc. No. 88, 76:16-18.) During that time, he had access to Pixels Matter's servers and access to confidential intellectual property for the project he was working on. (Doc. No. 88, 13:14-23.) Despite there being security measures in place, a motivated individual could access intellectual property that he is not privy to on Pixels Matter's servers. (Id., 57:12-25.) Additionally, it is possible to remove intellectual property from Pixels Matter's servers using an external drive connected directly to the computers. (Id., 57:8-11.) The Court heard testimony that not only did Defendant do that, but he has also said that he removed intellectual property belonging to L1 Technologies and Syncwise from Pixels Matter's servers. (Doc. No. 88, 15:2-8.)

In addition to hearing testimony that Defendant removed Plaintiffs' intellectual property, the Court also received into evidence multiple exhibits where Defendant claimed to have Plaintiffs' intellectual property and was attempting to sell it at a reduced price. (Doc. No. 86, Exs. 2, 3, 4, 10.) It took Plaintiffs many years to develop the intellectual property that Defendant was claiming to have developed overnight. (Doc. No. 88, 39:25-40:13.) None of the Plaintiffs ever consented or allowed Defendant to take their intellectual

property and to try to sell it to their customers. (Id., 24:17-21.) Thus, Plaintiffs have proven that Defendant converted their property by an unlawful act.

Generally, the "value of the converted property is the appropriate measure of damages for conversion." Lueter v. State of California, 94 Cal. App. 4th 1285, 1302 (2002); Cal. Civ. C. § 3336. "Ordinarily 'value of the property' at the time of the conversion is determined by its fair market value at the time." In re Brian S., 130 Cal.App.3d. 523, 530 (1982). A Plaintiff may also recover compensation for the reasonable amount spent to try to get the property back. Cal. Civ. C. § 3336. Here, Plaintiffs' witness testified that the value of the converted intellectual property is $5,000,000. (Doc. No. 88, 90:25-91:6.) The Court permitted Plaintiffs to support that amount with documentary evidence, but Plaintiffs declined to provide evidence to support that numerical value. (Id., 93:16-94:12.) Specifically, Plaintiffs did not submit any financial records or information regarding Plaintiffs' annual sales. (Id.) Plaintiffs also did not perform a forensic analysis to try and track down their intellectual property, instead they elected to save resources and stated that they are interested in injunctive relief. (Id., 93:16-94:12, 95:13-16.) Accordingly, Plaintiffs have proven their conversion claim and, given that Plaintiffs seek injunctive relief to prevent future harm from the conversion of their property, the Court will issue appropriate injunctive relief. Cal. C. Civ. P. §§ 525, 526.

**D.    Defamation Per Se – Plaintiffs L1 Technologies, Syncwise, and Pixels Matter**

"Defamation is an invasion of the interest in reputation." Smith v. Maldonado, 72 Cal.App.4th 637, 645 (1999). To state a claim for defamation per se that involves a private figure and is a matter of private concern, a plaintiff must prove that (1) the defendant made the statement to a person other than plaintiff; (2) that person reasonably understood that the statement was about the plaintiff; (3) the statement tended to injure the plaintiff in respect to his or her office, profession, trade, or business, and (4) the defendant failed to use reasonable care to determine the truth or falsity of the statement. Judicial Council of

California Civil Jury Instructions (2023), CACI No. 1704. "The tort involves the intentional publication of a statement of fact that is false, unprivileged, and has a natural tendency to injure or which causes special damage." Smith, 72 Cal.App.4th at 645. "Publication means communication to some third person who understands the defamatory meaning of the statement and its application to the person to whom reference is made." Id. "Publication need not be to the 'public' at large; communication to a single individual is sufficient." Id. And, the "mere fact speech is broadcast across the Internet by an anonymous speaker does not ipso facto make it nonactionable opinion and immune from defamation law." Bently Reserve L.P. v. Papaliolios, 218 Cal.App.4th 418, 429–31 (2013). Notably, the defamed person need not be a natural person. Live Oak Publishing Co. v. Cohagan, 234 Cal.App.3d 1277, 1284 (1991).[9]

Here, Defendant committed defamation per se in at least two instances: (i) when he made posts on his Instagram page about Plaintiffs, claiming that they were the "leaders of an obvious terrorist cell located at the address of [Pixels Matter's Ukrainian office address]" and would "forge documents, threaten, create discrediting content, and incite suicide"; and (ii) when he submitted a false report to the IRS that claimed Plaintiffs were committing tax law violations by hiding their income through their various affiliate businesses and overseas operations.[10] (Doc. No. 86, Exs. 7, 9.)

---

[9] Some defamation cases are subject to constitutional requirements—cases involving a public figure or a private figure speaking about a public issue. Nguyen-Lam v. Cao, 171 Cal.App.4th 858, 867 (2009) (public figure); Integrated Healthcare Holdings, Inc. v. Fitzgibbons, 140 Cal.App.4th 515, 522-23 (2006) (private figure, public issue). In those cases, the plaintiff must prove the statement is false. Id. However, in all other cases, including the case at hand, there is an assumption of falsity and truth is an affirmative defense where the burden is on the defendant to prove the statement is true. Ringler Assocs. Inc. v. Maryland Cas. Co., 80 Cal.App.4th 1165, 1180-81 (2000). Here, Defendant has not met his burden to prove the statement is true.

[10] Plaintiffs provided evidence of additional defamatory statements that all appear to be part of a unified plan. (Doc. No. 86, Exs. 6, 8.) Because the Court concluded that Plaintiffs have proven at least two instances of defamation per se, the Court declines to address these other instances.

A statement is any form of communication or representation, including words and pictures. Manzari v. Associated Newspapers Ltd., 830 F.3d 881, 883 (9th Cir. 2016).  In regards to the first instance, Plaintiffs have proven that Defendant made a statement—that Plaintiffs are the leaders of a terrorist cell and forge documents, threaten, create discrediting content, and incite suicide—about them because Defendant made multiple posts on his instagram page that either listed Plaintiffs by name or listed their address. (Doc. No. 86, Ex. 9.)  The Court heard testimony that the individual in the photo on the first page of exhibit nine is Defendant and that the posts are from his Instagram page. (Doc. No. 88, 82:13-15, 83:9-15.)  The fact that the statement was made on the internet is of no concern here.  See Bently Reserve L.P., 218 Cal.App.4th at 429–31 (2013) ("Internet posts where the tone and content is serious, where the poster represents himself as unbiased and having specialized knowledge . . . may indeed be reasonably perceived as containing actionable assertions of fact.")

In the second instance, Plaintiffs have proven that Defendant made a statement—that Plaintiffs were committing tax law violations—about them because the form Defendant filed with the IRS specifically lists L1 Technologies, Pixels Matter, and Syncwise on it in box 2(a). (Doc. No. 86, Ex. 7.)  On the form, Defendant checked the following boxes regarding Plaintiffs tax law violations: unsubstantiated income, unreported income, kickback, and failure to pay tax. (Id.)  The form also attaches a letter signed by Defendant where he again references all three Plaintiffs by name and states that they are "hiding [sic] taxes and hiding [their] real income." (Id.)

Plaintiffs have also proven that both statements tended to injure them.  A statement is defamatory if it deters people from associating with a defendant. Nygård, Inc. v. Uusi-Kerttula, 159 Cal.App.4th 1027, 1047-48 (2008).  Additionally, a single sentence within a long text can be defamatory even if the entire text is not defamatory. Balzaga v. Fox News Network, LLC, 173 Cal.App.4th 1325, 1338 (2009).  Here, in the first instance, the

statement that Plaintiffs are the leaders of a terrorist cell who forge documents, threaten, and incite suicide is clearly intended to deter people from associating with Plaintiffs. Additionally, the Court heard testimony that Plaintiffs' clients began to question their business as a result of Defendant's actions. (Doc. No. 88, 35:15-25, 36:14-37:3.) In the second instance, the Court heard testimony that Plaintiffs had to draft correspondence to the IRS to clear up the matter and that they were harmed by Defendant's submission. (Doc. No. 88, 62:7-10, 62:15-19, 66:4-7.) Accordingly, Plaintiffs have proven that Defendant's statements tended to injure them in their profession.

Next, to determine whether Defendant failed to use reasonable care to determine the truth or falsity of the statement, courts turn to factors such as hostility to plaintiff and whether the defendant was making inherently improbable assertions. See Reader's Digest Ass'n, Inc. v. Sup. Ct., 37 Cal.3d 244, 257 (1984). Here, Defendant was outwardly hostile towards Plaintiffs—he was verbally and physically combative during the three months he worked for Pixels Matter, he made multiple defamatory posts about them, and he tried to have them investigated by the IRS. (Doc. No. 86, Exs. 7, 9; Doc. No. 88, 14:13-21.) Additionally, Defendant's statements that Plaintiffs are the leaders of a terrorist cell who incite suicide are inherently improbable on their face. (Doc. No. 86, Ex. 9.) And, Defendant's statement that Plaintiffs were committing tax violations dating back to 2015 is also inherently improbable because the Court heard testimony that Defendant had no knowledge of Plaintiffs' financials and Pixels Matter and Syncwise didn't even exist from 2015 to 2017. (Doc. No. 88, 64:25-65:10.) Thus, Plaintiffs have proven that Defendant failed to use reasonable care to determine the truth of his statements.

In cases involving defamation per se, harm is presumed to exist as a result of the defamation. See Di Giorgio Fruit Corp. v. Am. Fed'n of Labor & Congress of Indus. Org., 215 Cal.App.2d 560, 577 (1963). Based on the presumption, a party can recover "general damages without proof of loss of injury." Id. A party can also receive injunctive relief, typically to enjoin a defendant from repeating statements already determined to be defamatory. Balboa Island Village Inn, Inc. v. Lemen, 40 Cal.4th 1141, 1148 (2007).

Here, Plaintiffs indicated that they are seeking injunctive relief instead of damages. (Doc. No. 86; Doc. No. 88, 94:25-95:20.) Accordingly, Plaintiffs have proven their claim for defamation per se and the Court will issue appropriate injunctive relief.

## CONCLUSION

After considering the demeanor of the witness who testified, the documentary evidence, the arguments of counsel, and the law, the Court rules in favor of Plaintiff Pixels Matter and against Defendant on its breach of contract cause of action in the amount of $55,000 plus costs as provided by law.  Additionally, the Court rules in favor of Plaintiffs L1 Technologies, Syncwise, and Pixels Matter and against Defendant on their intentional interference with contractual relationships, conversion, and defamation per se claims and will issue appropriate injunctive relief for those causes of action.   Each side is to bear its own attorneys' fees.

The Court orders Plaintiffs to submit a proposed order detailing the requested injunctive relief within **seven (7) days** from the date this Order is filed.

**IT IS SO ORDERED.**

DATED:     August 30, 2023

*[Signature]*
MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT